## KUHN et al. v. UNITED STATES. *

Circuit Court of Appeals, Ninth Circuit.
March 26, 1928.

No. 5162.

1. **Criminal law** ⬢⇒729—District attorney's questioning of unwilling state witness as to previous written statement held improper, but not prejudicial, in view of its withdrawal and admonitions to jury.

Action of district attorney, on it becoming apparent that state witness was unwilling to testify against defendant, in producing a purported written statement previously made by witness, and reading the question and answers therein contained, and questioning witness as to their correctness, *held* improper, but not prejudicial, in view of its withdrawal from jury's consideration on district attorney's own motion, and court's repeated admonitions to jury not to consider it.

2. **Witnesses** ⬢⇒380(5)—Party surprised by witness' adverse testimony may show inconsistent statements by witness at another time.

A party whose cause is injured by the unexpected answer of his witness may, on showing of surprise, neutralize the effect of the adverse testimony by proving that at another time witness made statements inconsistent therewith, but can never go further than the cancellation of the adverse answer by which the party is surprised.

3. **Witnesses** ⬢⇒380(5)—Party cannot introduce ex parte statements of own witness, by calling unwilling witness to stand.

Though party is not to be denied right to attempt to prove his case by an unwilling witness, he may not get before jury, under guise of impeachment, an ex parte statement of such witness, by calling him to the stand, when there is good reason to believe he will decline to testify as desired, and when in fact he only so declines.

*Reversed in part and rehearing denied, 25 F.(2d) —.

**4. Criminal law ☞673(4)—In conspiracy prosecution, introduction of memorandum showing pecuniary interest of all of defendants held not error, where limited as against defendant who wrote it (Cr. Code, § 37 [18 USCA § 88]; Joint Resolution Jan. 31, 1922 [42 Stat. 361]).**

In prosecution of several defendants, under Criminal Code, § 37 (18 USCA § 88), for conspiracy to export arms and munitions to China, in violation of Joint Resolution Jan. 31, 1922 (42 Stat. 361), introduction of a memorandum purporting to indicate pecuniary interests of the defendants and their several contributions to the enterprise, and reference thereto by district attorney in his argument, was not error, where it was repeatedly stated to jury that it was to be considered only as against defendant, in whose handwriting memorandum was written.

**5. Witnesses ☞262—Permission to recall witness is within trial court's sound discretion.**

Permission to recall a witness is clearly within the sound discretion of the trial court.

**6. Witnesses ☞264—Court in conspiracy prosecution held not to have abused its discretion in permitting recall of government witness for further testimony, which was relevant and material (Cr. Code, § 37 [18 USCA § 88]; Joint Resolution Jan. 31, 1922 [42 Stat. 361]).**

In prosecution of several defendants under Criminal Code, § 37 (18 USCA § 88), for conspiracy to export arms and munitions to China, in violation of Joint Resolution Jan. 31, 1922 (42 Stat. 361), court *held* not to have abused its discretion in permitting recall of government witness to testify as to certain instructions given to him by one or more of defendants as to place of delivery of guns, the testimony being relevant and material.

**7. Criminal law ☞508(1)—Court may accept testimony of accomplice, who made inconsistent statements, as making prima facie case, leaving question of his credibility and weight of evidence to jury.**

Even though government witness, testifying as to declarations made by some of defendants in course of alleged conspiracy, was an accomplice, and made inconsistent statements, court could properly accept his testimony as making prima facie case, and leave ultimate question of his credibility and weight of all the evidence to the jury.

**8. Criminal law ☞717—Reading by district attorney of provisions of law not clearly irrelevant, though not approved, held not prejudicial.**

Reading by district attorney in course of argument of brief provisions of law not clearly irrelevant to prosecution, though a practice not to be encouraged, was not prejudicial, there being no contention that purpose was to show that defendants were guilty of offenses other than that charged.

**9. Criminal law ☞829(3)—Requested instruction in conspiracy prosecution was properly refused, where it was likely to mislead jury and given instructions amply covered it (Cr. Code, § 37 [18 USCA § 88]; Joint Resolution Jan. 31, 1922 [42 Stat. 361]).**

In prosecution of several defendants, under Criminal Code, § 37 (18 USCA § 88), for con-

spiracy to export arms and munitions to China, in violation of Joint Resolution Jan. 31, 1922 (42 Stat. 361), court did not err in declining requested instruction that, if all defendants severally acted illegally with same end in view, there would be no conspiracy, unless acts were done pursuant to mutual agreement to conspire together to· accomplish illegal purpose, since instruction would be more likely to mislead jurors than guide them right, and where instructions given on subject were ample and correct.

**10. Criminal law ☞730(3)—Asking one of defendants in conspiracy prosecution as to assisting another in narcotic smuggling transaction held not prejudicial, in absence of bad faith, where question was stricken out and jury instructed to disregard it (Cr. Code, § 37 [18 USCA § 88]).**

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy, where government claimed that check given by one defendant to another constituted his interest in enterprise, whereas such defendant claimed it was given in part payment of loan, asking him on cross-examination whether such alleged loan was not paid in return for assistance in narcotic smuggling transaction *held* not to have been prejudicial, there being no showing of bad faith on part of district attorney in asking question, and question having been stricken on motion of defendant's counsel, with instructions to disregard it.

In Error to the District Court of the United States for the Southern Division of the Northern District of California.

Henry Kuhn, Daniel Guy Swinehart, K. C. Lee, Albert Moon, Wong Tai, Chew Fook Gum, Leong Duck, and Leong Chung were convicted of an offense, and they severally bring error. Affirmed.

Frank J. Hennessy and Marshall B. Woodworth, both of San Francisco, Cal., for plaintiffs in error Chew Fook Gum and K. C. Lee.

Frank J. Hennessy, of San Francisco, Cal., for plaintiffs in error Wong Tai and Albert Moon.

James B. O'Connor and Harold C. Faulkner, both of San Francisco, Cal., for plaintiff in error Kuhn.

Williams, Kelly, McDonald & Barry, of San Francisco, Cal., for plaintiff in error Leong Chung.

Thomas T. Califro, of San Francisco, Cal., for plaintiff in error Leong Duck.

Geo. J. Hatfield, U. S. Atty., and T. J. Sheridan, Asst. U. S. Atty., both of San Francisco, Cal., for the United States.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. Ten out of thirteen defendants named in an indictment returned in the Northern district of Califor-

nia on May 3, 1926, were found guilty as charged, and from judgments of fine and imprisonment eight of them, Henry Kuhn, Daniel Guy Swinehart, K. C. Lee, Albert Moon, Wong Tai, Chew Fook Gum, Leong Duck, and Leong Chung, severally bring error.

Based upon section 37 of the Criminal Code (18 USCA § 88), the indictment charges a conspiracy to export arms and munitions of war from the United States to China in violation of a Joint Resolution of Congress approved January 31, 1922 (42 Stat. 361), prohibiting such exportation under conditions therein named. In substance the resolution provides that, whenever the President finds that in any country in which the United States exercises extraterritorial jurisdiction (as in China), conditions of domestic violence exist which may be promoted by the use of arms and munitions procured from the United States, and makes proclamation thereof, it shall be unlawful to export such supplies from any place in the United States to such country until otherwise ordered by him, except under such conditions as he may prescribe. Pursuant to the resolution, President Harding, on May 4, 1922, issued a proclamation making the inhibition, without exception or limitation, applicable to China, and such was the law during the entire period covered by the alleged conspiracy.

Specifically the indictment charges that the conspiracy was entered into on or about July 1, 1923, its object being to "export arms and munitions of war from the United States of America into China," and that it was continuously in existence and in process of execution throughout all the time from and after the 1st day of July, 1923, and at the time or times of the commission of each of the overt acts as set forth in the indictment. Nineteen overt acts are pleaded as having been performed in furtherance of the conspiracy, all within the period from October, 1923, to June, 1924, inclusive, most of them being in December, 1923, and January and March, 1924.

The principal witness for the government was one Borresen, who upon a plea of guilty, in the United States Court in China, to a charge of bringing arms into that country, had been sentenced to a year's imprisonment. He testified in substance that in July, 1923, he was employed by the defendant Swinehart to take guns to China. For that purpose, later in 1923, he bought the boat W. H. Talbott, and after putting her in condition he took on several cases of guns at San Francisco, and then a cargo of lumber at Coos Bay, Or., destined for Shanghai. The Talbott sailed from San Francisco on January 24, 1924, and arrived outside of Coos Bay three days later. Having there received the cargo of lumber, she sailed for Shanghai on April 1st, touching at Honolulu on April 21st, and reaching Shanghai June 18th. Upon arrival at Shanghai, the cargo of lumber was discharged and the boat was raided and seized. Other witnesses were called in corroboration, and to connect the several defendants with the enterprise.

The assignments are numerous, but those urged in the several briefs (seven in number) involve the following points:

(1) Declination of the court to advise the jury to acquit.

(2) Whether the evidence sufficiently tended to show the arms were destined for China, or only for Hong Kong.

(3) Rulings in permitting the government to impeach its own witness, Lee Yuk.

(4) Use by government of an exhibit (No. 24) purporting to contain a list of participating owners in the voyage of the Talbott.

(6) A further point, urged by defendants Moon, Lee, Wong Sue Jung, and Chew Fook Gum, involves rulings concerning certain testimony of the witness Borresen.

(6) Urged by defendants Moon and Wong Sue Jung, that there was error in permitting the district attorney to read to the jury from law books.

(7) Urged by defendant Chew Fook Gum, that the district attorney was permitted to argue to the jury the violation by this defendant of other laws.

(8) Chew Fook Gum also assigns as error certain instructions given and certain requests refused.

(9) Point, urged by the defendant Kuhn, that part of his cross-examination was improper.

1 and 2. That at least some of the defendants joined in an enterprise to transport arms from the United States either to Hong Kong or into China, the record leaves no room for doubt. And, when we consider the condition of domestic violence then existing in China, the improbability of British territory being intended as the ultimate destination of such an expedition, and the clandestine manner in which it was organized and carried out, together with the express statements of some of the defendants and other circumstances in evidence, it is difficult to escape the conviction that the arms were intended for China as alleged. The mere fact that at times some of the defendants made

contrary statements is inconclusive. Through the screen of self-serving declarations of an innocent purpose it was within the province of the jury to discern the real character of the enterprise.

Manifestly it would be impracticable, within the reasonable compass of an opinion, to set forth a comprehensive analysis of the voluminous direct and circumstantial evidence relied upon by the government to establish the connection of all the defendants with the scheme. It must suffice to say that, mindful of the possibility that, where there are so many defendants, the jury may have failed discriminatingly to consider the case of each separately, we have carefully examined the entire record, and by it are convinced that the lower court was right in denying a motion for a directed verdict, and that in no case was the conclusion reached by the jury unreasonable. True, the specific circumstances relied upon to show participation by some of the defendants are meager, but when they are viewed in the light of the record as a whole they furnish substantial ground upon which to predicate the finding of guilt.

[1-3] 3. Lee Yuk was called as a witness for the government, was interrogated with regard to an incident deemed to be material, but from his answers to a few questions put to him it at once became apparent, either that he had no knowledge, or that he was unwilling to testify against the defendants. Thereupon the district attorney produced what he represented to be a written statement previously made by the witness to government agents, and over the strenuous and repeated objections of defendants he was permitted to read from the document each question and answer therein contained, with a question to the witness, in each case, whether he was not so asked and did not so reply. The procedure was improper, and after reflection, during an ensuing recess of the court, the district attorney, upon the coming in of the court, of his own motion consented that all the objections be sustained, and that all the testimony be withdrawn from the consideration of the jury. Thereupon the court struck out the testimony, with an admonition to the jury not to consider it, and again in the final instructions explicitly so advised the jury.

While, in view of these repeated admonitions and the other circumstances of the case, we are unable to believe the original error was prejudicial (Penn. Co. v. Roy, 102 U. S. 451, 26 L. Ed. 141; Wells v. United

24 F.(2d)—58

States [C. C. A.] 9 F.[2d] 335; Marron v. United States [C. C. A.] 18 F.[2d] 218), we deem it proper to express our disapproval of the practice here indulged. A party whose cause is injured by the unexpected answer of his witness may, upon a showing of surprise, neutralize the effect of the adverse testimony by proving that at another time the witness has made statements inconsistent therewith. But the range of the rule is narrow, and its limitation should be carefully observed. The maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised. That being true, in cases, as here, where the witness gives no testimony injurious to the party calling him, but only fails to render the assistance which was expected by professing to be without knowledge on the subject, there is no reason or basis for impeachment under the rule. He has done no harm, and there is nothing to cancel or neutralize. While a party is not to be denied the right to attempt to prove his case by an unwilling witness, he is not permitted to get before the jury, under the guise of impeachment, an ex parte statement of such witness, by calling him to the stand when there is good reason to believe he will decline to testify as desired, and when in fact he only so declines.

[4] 4. The government's Exhibit No. 24 is a slip of paper in the nature of a memorandum, the notations upon which purport to indicate the pecuniary interests of some, if not all, of the defendants in, and their several contributions to, the enterprise. It was conceded to be in the handwriting of the defendant Swinehart, and it was offered and received in evidence, with the reiterated statement in the presence of the jury that it was to be considered against him only.

In the course of his argument the district attorney called the attention of the jury to some of the notations, which he interpreted as referring to defendants other than Swinehart, but with the attendant declaration that he was arguing only as to Swinehart. While it was a delicate subject, to be handled with care, we are unable to say that he exceeded the bounds of propriety. It must be borne in mind that Swinehart was not on trial for a distinct, substantive offense, but upon a charge of conspiring with his codefendants. It was necessary for the government to prove, not merely that he transported the arms, but that he conspired with the others to that end. The document, in his handwriting, was offered as a part of such proof, it

being in the nature of an admission, not merely that he participated in the enterprise, but that he participated with certain other persons, namely, the defendants, as alleged. To deny the right of the district attorney to refer to the other names on the list would be to hold that the government could prove, as against Swinehart, by his own admission, that he had participated in the enterprise, but not that he had conspired or participated with the other defendants. Such a view is manifestly untenable.

[5, 6] 5. The court permitted the recall of the witness Borresen by the government for further direct examination, and thereupon he gave testimony as to certain instructions which he claimed were given to him by one or more of the defendants, both before and after he reached China, to deliver the guns about 60 miles south of Hong Kong. Permission to recall the witness was clearly within the sound discretion of the court. Austin v. United States (C. C. A.) 4 F.(2d) 774; Marron v. United States (C. C. A.) 8 F.(2d) 251; Horowitz v. United States (C. C. A.) 12 F.(2d) 590. And we do not find that such discretion was abused. That the testimony was relevant and material cannot be doubted, and that it may have been measurably inconsistent with his other testimony affected its weight, but did not render it incompetent. Like considerations apply to the manner in which the testimony was elicited and given.

[7] The other contention made under this branch of the case is that it was error to permit Borresen to testify as to declarations made by defendants, particularly Chew Fook Gum, in the course of the alleged conspiracy, upon the ground, as argued, that Borresen's direct testimony (which, if believed, undoubtedly made out a case of conspiracy) was so "discredited" that it could not be accepted as sufficient for that purpose. But, even though he was an accomplice, and may have made some inconsistent statements, the trial court could with entire propriety accept his testimony as making a prima facie case, and proceed accordingly in the reception of other proofs, leaving the ultimate question of his credibility and of the weight of all the evidence to the jury under appropriate instructions.

[8] 6 and 7. We find nothing prejudicial in the reading by the district attorney in the course of his argument to the jury of brief provisions of the law relative to the registration of vessels and the duty on arms. It is not urged that the passages read were incorrect statements of the law, and it is only feebly argued that the considerations thus suggested were irrelevant. The practice is not to be encouraged, but we are unable to say that what the court here permitted constituted an abuse of discretion, or that the defendants were in any wise prejudiced. There was no contention at the time that the reading of these provisions was for the purpose of showing that defendants, or any of them, were guilty of offenses, other than that charged, no exception was taken on that ground, and from the record as presented by the bill of exceptions we cannot say that such was the district attorney's purpose, or that any such notion was conveyed by him to the jury.

8. The instructions given were so comprehensive and fair that the exceptions in that respect scarcely warrant discussion. The court clearly gave the jury to understand that, being within the extraterritorial jurisdiction of Great Britain, the port of Hong Kong was not to be deemed to be in China, but very properly added in that connection that, even if the scheme was to have the Talbott touch at Hong Kong, and then proceed to China and land the arms there, the case would fall within the scope of the indictment.

[9] The requested instruction, declined by the court, that if all the defendants severally acted illegally, with the same end in view, there would be no conspiracy "unless such acts of such several defendants were done pursuant to a mutual agreement to conspire together to accomplish the illegal purpose," would be more likely to mislead the jurors than to guide them aright, and the instructions given upon the subject were ample and correct.

[10] 9. The government introduced evidence tending to show that defendant Kuhn was on the Talbott, making some repairs, at midnight, about the time the guns were taken on board at San Francisco, that he had afterward gone with some of the parties to Coos Bay while the vessel was receiving the lumber, and that he had given a check to Swinehart for $820, which, together with certain credits, made up the $1,000 interest the government claimed he had in the enterprise. When called as a witness in his own behalf, he testified upon his direct examination that the check was given in part payment of a loan of $2,500 made to him by Swinehart some time prior thereto, as to which loan, however, no note or other record was produced. Upon cross-examination the district attorney asked him whether, as a matter of fact, the $2,500 paid to him by Swinehart,

and which he had referred to as a loan, was not in return for his assistance in some narcotic smuggling transaction. Objection having been overruled, he answered: "Absolutely no."

Manifestly, the question was germane to the direct testimony, and the conduct of the district attorney could be regarded as reprehensible only upon the assumption that he acted in bad faith, and upon that point there is no proof, other than such as inheres in the question itself and the fact that no evidence upon the subject was offered in rebuttal. When the testimony closed, counsel for the defendant moved that the question and answer be stricken, and the motion was granted, with an instruction by the court to the jury to disregard them. Such a question ought not to have been asked, unless the district attorney had reason to believe the fact could be established; but, upon the record, we cannot say he acted in bad faith. And, considering all that occurred, it would be a great strain to infer prejudice. We think it more reasonable to assume prejudice to the prosecution, for such a question, if not well founded, is very likely to act as a boomerang.

Judgment affirmed.